**Jeffrey Paul HALE, Appellant,**

v.

**The STATE of Texas, State.**

**Nos. 2–02–159–CR, 2–02–160–CR.**

Court of Appeals of Texas,
Fort Worth.

March 11, 2004.

Rehearing En Banc Overruled
May 20, 2004.

Kearney Law Firm, Wm. Reagan Wynn, Westfall, Platt & Cutrer, Greg Westfall, Fort Worth, TX, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Tanya S. Dohoney, Alton R. Estrada, David Hagerman, Mary Butler, Assistant Criminal District Attorneys, Fort Worth, TX, for State.

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

Appellant, Jeffrey Paul Hale, appeals from his conviction for two counts of fondling/indecency with a child and one count of aggravated sexual assault of a child. In two points, appellant argues that he received ineffective assistance of counsel and that the trial court erred by excluding evidence that two of the alleged victims had engaged in prior sexual conduct with each other. We affirm the trial court's judgments.

## FACTS

Appellant attended the Door of Hope Church in Arlington, Texas. Appellant met J.S., a twelve-year-old boy, and J.S.'s mother through the church. J.S.'s mother arranged for appellant to mentor J.S. Although J.S.'s mother and appellant initially intended appellant to mentor only J.S., she also got appellant involved with J.S.'s brothers, including her stepson R.D.

During their first meeting in 1998, appellant took J.S. and his brother J. to lunch. On the next visit, appellant took J.S. to his apartment to watch a movie and spend the night. J.S. was alone with appellant during this visit. J.S. testified that appellant fondled his penis while they were watching a movie. After being fondled,

J.S. got up and went to appellant's bedroom and fell asleep. Later that night, J.S. woke up because appellant was "messing with [his] penis" and trying to masturbate him. J.S. panicked, moved away from appellant, zipped up his pants, and told appellant to leave him alone.

Early the next day, J.S. woke up and went to the bathroom. When he returned, appellant pulled him down onto the bed, rolled him onto his chest, and pulled down his pants. Appellant put his penis in J.S.'s anus and moved up and down on top of him until he ejaculated. According to J.S., appellant threatened to hurt his family if J.S. told anyone what had happened.

J.S.'s stepbrother R.D. also testified against appellant. R.D. testified that he went with appellant the second time appellant went out with J.S. During one visit to appellant's apartment, R.D. and appellant were watching television when appellant began kissing R.D. on the cheek and the lips. Appellant unbuttoned R.D.'s pants and began rubbing his penis.

R.D. and J.S. also spent the night at appellant's apartment during other visits. On those occasions, appellant would sleep in the bed with the boys. While in bed, appellant would kiss R.D. Appellant also tried to put R.D.'s hand on appellant's penis.

Accusations against appellant came to light when J.S. sexually assaulted his three-year-old brother in the shower by forcing his penis between his brother's legs and into his brother's anus. The three-year-old told a neighbor what happened, and the neighbor then told J.S.'s mother. In response, J.S.'s mother asked him if anyone had ever done anything similar to him. It was then that J.S. first told his mother that appellant had assaulted him. At trial, J.S.'s credibility was attacked, and he admitted to lying to the Child Protective Services (CPS) worker and his mother about assaulting his little brother.

While R.D. was on the stand, the defense attempted to elicit testimony concerning sexual activity between the two boys (J.S. and R.D.). Outside the presence of the jury, R.D. testified that sexual activity was going on between his stepbrother (J.S.) and himself. Specifically, he said that he and J.S. were having oral sex and were doing "penises to the buttocks type stuff" with each other for years. R.D. confirmed that after J.S. assaulted his little brother, J.S.'s mother called and asked him about the nights he spent at appellant's and things that had happened between J.S. and him. R.D. did not clarify whether he was referring to things that happened between he and appellant or he and J.S. The trial court disallowed R.D.'s testimony relating to his sexual activity with his stepbrother.

The last witness called by the State during the guilt-innocence phase of trial was Brandon Williams. Williams was the pastor of the Door of Hope Church when the boys first accused appellant of assaulting them. Williams testified that although appellant attended his church, he never became an official member. He also denied that the church recommended appellant as an official mentor for J.S., claiming that J.S.'s mother and appellant made the arrangements on their own. At some point, Williams received a three-way call from J.S.'s mother and R.D.'s mother alleging that appellant had sexually abused their sons. Approximately four days later, Williams called appellant on his cell phone and informed him that allegations of sexual abuse had been made against him. According to Williams, appellant began to say "Oh my God, oh my God" over and over again. Appellant then told Williams that one evening while the boys were at his home, he heard them making some noise

in the other room, and when he went to investigate, he saw the boys "messing with each other" or "playing with each other." Williams asked appellant whether he had ever done anything he should not have done to the boys. After a moment, appellant answered that he touched them once. Williams warned appellant that no privilege attached to their discussion, that he would have to report the allegations, and that appellant should retain an attorney.

Williams also testified about occasions when appellant babysat with his children. He stated that on the last occasion that appellant babysat for his family in February 1999, he and his wife felt uneasy about appellant staying with their children. Although Williams inquired, none of the his children ever made any allegations of sexual abuse against appellant.

At the guilt-innocence stage of trial the defense called only one witness, J.S.'s mother, to testify about the sexual relationship between J.S. and R.D. However, the trial court sustained the State's objection to her testimony after she testified outside the presence of the jury. The jury never heard her testimony. The jury found appellant guilty on all counts.

During the punishment phase of trial, the State presented seven witnesses. The defense did not present any witnesses. The first to testify for the State was Joan Morais. She met appellant through her son when he attended the First Baptist Church in Dayton. She had known appellant for eleven years. Appellant approached Morais for help in forming Child Heart Ministries. Once the ministry was formed, Morais served as a member of the board along with Janet Harrelson (appellant's mother), Randy Piatt, Molly Plant, and Ted Plant. The goal of the ministry was to help get children off the street, find homes for them, and introduce them to God.

Because Morais was well connected in the country of El Salvador, appellant asked her to help him arrange a visit to El Salvador because he thought it would be a good place to begin his ministry. Morais put appellant in contact with her husband's cousin, Olga Miranda, who lived there. While in El Salvador, appellant met several boys on the street and found them places to live. Appellant even brought two boys (ages ten or eleven) back to Dayton where they stayed with him at his mother's house. Appellant hoped to adopt one of them, but was unable.

Sometime after the ministry began, Morais received a phone call from Randy Piatt who told her that appellant had left El Salvador and that the ministry was to be dissolved. Morais then received a call from Olga Miranda who was upset with Morais for sending someone like appellant to her country. Morais learned from Miranda that appellant fled from El Salvador because he had allegedly molested some boys and that he would be arrested if he ever returned.

Piatt was the second witness to testify for the State. He was the pastor of the First Baptist Church in Dayton and had known appellant since appellant was five years old. Piatt testified that appellant came to his office after abruptly leaving El Salvador. Appellant told Piatt that he had gotten in trouble with the law because he had fondled the genitals of some of the young boys in El Salvador. Appellant stated that if he returned to El Salvador he would be arrested and he feared the United States would extradite him. Piatt recommended that appellant leave the childrens' ministry and return to school.

Next, the State called Dennis Johnson. Johnson was a Baptist missionary who met appellant while he and his family were furloughed in Arlington, at the Door of

Hope Church in 1996. Johnson and his wife had four children (three boys and one girl). Appellant seemed particularly fond of A.J. and his brother (two of Johnson's sons) and lavished them with gifts. Appellant visited the Johnson family in Mexico City several times and stayed in their home. During one visit, appellant asked if A.J. could sleep in his room with him and Johnson said "no." At one point, Johnson decided to talk to his boys about possible sexual abuse because of accusations against a youth minister that the boys knew. During that discussion, A.J. told his father that appellant had fondled him and touched him in a sexual manner while visiting the family in Mexico City.

A.J. testified next and corroborated his father's testimony. A.J. testified that when he and his brother slept over at appellant's house, all three slept in appellant's bed together with appellant in the middle. One night, appellant put his hand into A.J.'s pants and began touching his penis. On another occasion when A.J. was eight, he and his brother spent the night with appellant at a friend's house in Mexico City. Appellant slept in the middle between the two brothers. During the night, appellant began kissing A.J. on the lips and touched his penis.

Next, the State called Barry Smith who owned two foster homes in the country of Belize. Appellant met Smith while working at an orphanage in Belize and eventually came to work for Smith at one of his foster homes. Smith testified that he had problems with appellant sleeping with the young boys. Appellant would sleep with the boys in the same bed and wrap his arms around them from behind. Although Smith spoke to appellant about this practice, appellant refused to stop sleeping with the boys even though he had his own bed. After appellant left the home, Smith spoke to the boys, specifically G.C. G.C.

was twelve at the time and testified that he told Smith that appellant fondled his penis.

Janice Gooch was the last witness to testify for the State during the punishment phase. She testified that appellant started Foundation Amistad in Columbia to help street children and that she contributed to his cause. Although appellant told her about the allegations of sexual abuse, saying that he was involved in an "incident," she stated that she believed appellant was innocent and had no problem with him being around her children.

The trial court sentenced appellant to ten years' imprisonment for each count of indecency with a child/fondling and forty years' imprisonment for aggravated sexual assault of J.S., the sentences to run concurrently. After sentence was imposed, appellant retained new defense counsel who filed a motion for new trial alleging ineffective assistance of counsel.

At the hearing on the motion for new trial, appellant's new counsel presented testimony from witnesses who said that they would have been willing to testify for appellant at trial had they been asked. Most witnesses testified generally about appellant and his good character. However, some testified to witnessing appellant interact with the victims in the case.

Debbie Joines testified first on appellant's behalf. She knew appellant through the Door of Hope Church in Arlington. Appellant's trial lawyers never contacted Joines either before or during appellant's trial. She stated that if she had been called to testify for appellant, she would have provided evidence that appellant was listed in the church directory as a member of the Door of Hope Church. This testimony would have contradicted the guilt-innocence testimony of Brandon Williams who testified that appellant had never joined the church. Joines also testified

that she and appellant were both present at a church meeting where the attendees discussed finding a suitable mentor for J.S.

Flavio Ferreira, a friend of appellant's from Brazil, also testified that he was not contacted by any of appellant's trial lawyers either before or during appellant's trial. Had he been called to testify for appellant, he would have testified that he stayed at appellant's apartment in December of 1998. While there, two boys, approximately ages nine and thirteen, visited appellant's apartment. Ferreira noted that the boys were comfortable around appellant and that appellant did nothing inappropriate to the boys while he was visiting. Ferreira visited appellant again in the summer of 1999 and stayed at his apartment for a month. No boys spent the night during this visit.

Ronald Maurice testified that appellant's trial counsel never contacted him before or during the trial. If called to testify, he would have been able to testify to appellant's demeanor while they worked at an orphanage in El Salvador. In 1996, Maurice observed appellant working with children at an orphanage three to four times a week over the course of a month. The children all seemed comfortable with appellant, and Maurice never observed appellant do anything inappropriate to the children. Maurice actually helped appellant bathe some of the children.

At another time, appellant and Maurice drove supplies to El Salvador together. While there, they stayed at an orphanage for three to four days. The orphanage housed only boys, and Maurice never saw appellant act inappropriately with them. He also never noticed that the boys were scared or uncomfortable around appellant. Maurice never saw appellant sleep in the same bed with any of the boys. Overall, Maurice considered appellant to have excellent character.

Appellant's trial counsel interviewed appellant's roommate Argelio Bolanos, but decided that it was best for him not to testify. Bolanos testified at the hearing, however, that there were several subjects he could testify to that were favorable to appellant that trial counsel failed to ask him about during the interview. Appellant and Bolanos were roommates from November 1997 through June 1999. Bolanos testified that he met J.S. at the Door of Hope Church while attending church with appellant. Bolanos stated that J.S. spent the night at appellant's apartment two to three times during late 1998 and early 1999.

Bolanos described how appellant's bedroom was not very private because the door never closed completely and always stayed open approximately six inches. He testified that when J.S. slept over he slept on a mat on the floor of appellant's bedroom that could be seen through the crack in the door. He also described the blinds in appellant's bedroom, noting that there was a gap on all sides of the blinds, which allowed a person standing outside the bedroom to look through. Bolanos stated that appellant's original trial lawyers never asked him about the lack of privacy in appellant's bedroom.

Bolanos further testified that R.D. stayed overnight at appellant's in May or April of 1999. That night Bolanos came home at approximately 10:30 p.m. and found R.D. sleeping on the couch and J.S. sleeping on the floor mat in appellant's room. Bolanos never saw appellant act inappropriately with J.S. or R.D. and noted that they always seemed at ease around appellant.

Bolanos also accompanied appellant to the Johnson home. When they arrived at the Johnson's, the children were excited to see appellant, did not act threatened, and

Bolanos said he never saw appellant act inappropriately toward any of the children. Appellant's former trial lawyers, however, never asked Bolanos about the Johnson family.

Bolanos also helped appellant babysit Brandon Williams's children on Valentine's Day in 1999. While babysitting, Bolanos never saw appellant do anything inappropriate with the children, nor did he see the children act in a manner that would indicate that they were scared or apprehensive around appellant. When the Williams returned from dinner, Bolanos noted that they did not seem uneasy. On the contrary, Bolanos testified that they were appreciative and thanked appellant for taking care of the children. Although Bolanos told appellant's former trial counsel about babysitting the Williams children, no one ever followed up or interviewed him on the subject again.

Appellant's former trial counsel testified at the hearing, stating that they chose not to call Bolanos as a witness because his testimony would have shown that he regularly went to prayer group meetings on the same two nights every week and often would spend the night at his mother's or aunt's house on those evenings. Appellant and his counsel made a strategy decision not to call Bolanos because they feared that his testimony would ultimately have helped the State's case because it would have shown that appellant was routinely alone in the apartment on certain days every week. At the hearing on the motion for new trial, Bolanos testified that he never told appellant's counsel that he often slept somewhere other than at appellant's apartment. Bolanos clarified, stating that he told appellant's trial counsel that he often came home late after prayer meetings, but that he never told appellant when he could be expected to return home.

Appellant's trial attorneys also testified that the decision not to call any witnesses to testify at the guilt-innocence and punishment stages was a strategy decision. The attorneys and appellant together decided that it was best if appellant did not testify on his own behalf because appellant was worried that he might say the wrong thing and open the door to issues that he did not want to come out. During trial, counsel asked appellant if he would consider testifying, and appellant sent them a note saying that he would not.

With regard to the punishment phase, appellant's trial counsel decided that instead of calling witnesses, they would have the witnesses submit affidavits to the officer conducting the Pre–Sentence Investigation. Appellant agreed to the strategy after a lengthy discussion with his attorneys regarding the fact that any witness that took the stand would be subject to cross-examination. Appellant did not want any of his friends or family subject to cross-examination and agreed that it would be better for the witnesses to submit affidavits.

In preparation for their case, appellant's trial counsel relied heavily on the State's open file policy and an oral agreement with the prosecution regarding notice of plans to introduce extraneous offenses. Attorney Don Turner was first retained by appellant on his case in the summer or the fall of 1999. Turner hired an investigator, but the investigator had little success because the people he found were unwilling to talk to him about appellant's case. Turner said that he interviewed appellant approximately twenty times in person and had numerous phone conversations with him. Turner testified that the decision not to call witnesses was a strategy decision that he, appellant's other trial counsel, and appellant made together after discussing

the pros and cons of exposing witnesses to cross-examination.

Appellant also retained attorney Robert Bush approximately two to three months before trial. Bush did not interview any possible witnesses except for Bolanos and appellant. Bush further corroborated Turner's testimony regarding the strategy decision not to call any witnesses in light of appellant's decision not to testify on his own behalf. After the guilt-innocence phase of trial, appellant wrote his trial attorneys a letter complementing them on their professionalism, stating that they were very good at what they do, and thanking them for their hard work on his case.

Appellant's mother Janet Harrelson also testified at the hearing on the motion for new trial. She testified that appellant called her after he allegedly confessed to Brandon Williams. Appellant told her about the accusations of sexual abuse. He stated that Williams had asked him whether he had touched the boys, and appellant had said "yes, I have" but that Williams cut him off before he could explain that the touching was not in a sexual way.

Harrelson also testified that she was present during the meeting with Piatt where appellant allegedly confessed to the allegations of abuse that occurred in El Salvador. Harrelson stated that she never heard appellant confess. She also related her observations of appellant with J.S., the Johnson family, and the Williams family. Whenever appellant and his mother ran into any of them, both the children and their parents seemed happy to see appellant and would greet him warmly.

Harrelson also visited appellant while he was working at the children's home in Belize. While there, she saw nothing to indicate that G.C. was scared or uncomfortable around appellant. She also allowed appellant and the two young boys

from Belize to stay in her home while they were visiting appellant. She never saw appellant do anything inappropriate with the boys. Appellant's former trial counsel never questioned her about information relating to the boys from Belize.

## INEFFECTIVE ASSISTANCE OF COUNSEL

First, Appellant complains that his trial counsel was ineffective, thereby depriving him of his Sixth Amendment right to counsel. *Strickland v. Washington* sets out the standard for appellate review of trial counsel's effectiveness during the guilt-innocence and punishment phases of a noncapital trial. 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The standard was adopted by the Texas Court of Criminal Appeals in *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex.Crim.App.1999). We apply a two-pronged test to ineffective assistance of counsel claims. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim. App.1999); *Hernandez*, 988 S.W.2d at 770. First, appellant must show that his counsel's performance was deficient; second, appellant must show the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Hernandez*, 988 S.W.2d at 770.

In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson*, 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *Strickland*, 466 U.S. at 688–89, 104 S.Ct. at 2065. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable pro-

fessional judgment." *Id.* at 690, 104 S.Ct. at 2066. An allegation of ineffective assistance must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson,* 9 S.W.3d at 814. Our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

▆▆▆ The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable. *Id.* at 687, 104 S.Ct. at 2064. In other words, appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* at 697, 104 S.Ct. at 2070. A claim of ineffective assistance of counsel must be proven by a preponderance of the evidence, and the burden is on the defendant to prove his claim. *See Rylander v. State,* 101 S.W.3d 107, 110 (Tex.Crim.App.2003); *Bone v. State,* 77 S.W.3d 828, 833 (Tex.Crim.App. 2002).

▆▆▆ An ineffective assistance of counsel claim may properly be raised in a motion for new trial. Where a timely and adequate motion for new trial, supported by affidavit and raising matters not shown by the record, is presented to the trial court, the trial court must hold a hearing on the motion. *Reyes v. State,* 849 S.W.2d 812, 814–16 (Tex.Crim.App.1993). In the case at bar, appellant's counsel first raised the ineffective assistance claim in a motion

for new trial. The trial court denied appellant's motion. However, his appeal is not based upon the trial court's denial of his motion for new trial. Appellant brings his appeal based upon the constitutional right to effective assistance of counsel solely under the Sixth Amendment. Even so, the State argues in its brief that the trial court's decision to deny appellant's motion for new trial should be reviewed under an abuse of discretion standard.

Although we agree that the State's argument is correct with regard to a denial of a motion for new trial, it is not applicable to this appeal because appellant does not complain of the trial court's decision to deny his motion for new trial. Appellant brings his appeal on constitutional grounds. As such, it is not necessary that a defendant raise his ineffective assistance claim at trial or in a motion for new trial in order to raise it on appeal. *Robinson v. State,* 16 S.W.3d 808, 809–11 (Tex.Crim. App.2000). Therefore, we hold that appellant did not waive his complaint of ineffective assistance of counsel and it is properly brought for the first time on appeal. As we noted above, we apply the two-prong standard of review under *Strickland v. Washington* to claims of ineffective assistance of counsel under the Sixth Amendment.

Appellant's complaints about the effectiveness of his trial counsel center around his attorneys' failure to investigate witnesses whose names were given to them by appellant. During the hearing on the motion for new trial, appellant's former trial counsel established on the record that they did not call any witnesses because they were concerned about the nature of the testimony that would develop at trial.

### Guilt–Innocence Phase of Trial

▆▆▆ With regard to the guilt-innocence phase, appellant's counsel failed to inter-

view Joines and Harrelson concerning whether appellant was indeed a member of the Door of Hope Church and whether the church had requested that appellant serve as a mentor to J.S. Appellant argues that had Harrelson or Joines testified, their testimony would have impeached Williams's testimony on these issues. Additionally, Harrelson could have clarified appellant's alleged phone confession to Williams regarding the abuse allegations. Appellant contends that Harrelson's testimony concerning appellant's statements would have been admissible as excited utterances and directly contradicted Williams's testimony that appellant made an admission.

Ferreira, Harrelson, and Bolanos could have testified during guilt-innocence regarding appellant's interaction with J.S. and R.D. All three testified that the boys seemed comfortable around appellant and that appellant never did anything inappropriate to the boys. However, none of these witnesses could testify to the facts surrounding the alleged acts of sexual abuse. None of appellant's proposed witnesses could provide an alibi or alternate version of the facts surrounding the boys' allegations. Bolanos was the only witness that had potential to be a fact witness, but appellant's attorneys ultimately decided that he was a character witness. Overall, appellant's trial counsel determined that all of appellant's proposed witnesses could only be offered as character witnesses. In this capacity, the witnesses would be subject to impeachment using "have you heard" or "did you know" questions on extraneous offenses. Appellant's counsel decided that more harm than good would come out of the testimony of these witnesses.

Appellant argues that his case is analogous to *Butler v. State* where the court of criminal appeals held that defense coun-

sel's failure to interview potential eyewitnesses fell below the objective standard of reasonableness. 716 S.W.2d 48, 56 (Tex. Crim.App.1986). However, appellant ignores the fact that in *Butler* the witnesses were eyewitnesses to part of the crime and an alibi witness who lived with the defendant. *Id.* at 51–53. The eyewitnesses both testified at the hearing on the motion for new trial that the defendant was not the man who robbed the convenience store on the day in question. *Id.* at 51–52. The alibi witness lived with the defendant and testified at the hearing that at the time of the robbery the defendant was in the apartment with her. *Id.* Additionally, the defense counsel failed to present evidence that would have corroborated the defendant's testimony that he was on the phone with his sister near the time of the robbery. *Id.* at 52. The phone records were easily accessible, and the defendant's sister was willing to testify to the fact that she spoke to the defendant on that morning. *Id.*

Butler's defense counsel argued that they did not call eyewitness Sergeant Williams because they were afraid that he would be impeached by the police reports. *Id.* at 56. The court stated that fear of impeachment was not a justification for not interviewing the witness at all. *Id.* Defense counsel could not articulate a reason for its failure to call the alibi witness or other eyewitness to the robbery. *Id.* at 55–56. Ultimately, the court held that the defense counsel had failed both prongs of the *Strickland* test, affirmed the decision of the court of appeals, and remanded the case for a new trial. *Id.* at 57.

In the present case, appellant's trial counsel failed to interview potential witnesses who could have testified favorably for appellant during the trial. However, the present case can be distinguished from *Butler* because none of appellant's poten-

tial witnesses had any personal information concerning the accusations made by the two victims. None of appellant's proposed witnesses could provide an alibi or an eyewitness account of what occurred between appellant and the victims. At best, some of the witnesses could offer testimony on their personal observations of appellant interacting with the victims on other occasions and statements to the effect that nothing inappropriate occurred while the witnesses were present.

Appellant also argues that the present case is analogous to *Ex Parte Duffy*, 607 S.W.2d 507, 508–09 (Tex.Crim.App.1980), *overruled by Hernandez v. State*, 988 S.W.2d 770, 770 (Tex.Crim.App.1999). However, *Duffy* has since been overruled by the Texas Court of Criminal Appeals in *Hernandez* where it held that both prongs of the *Strickland* test are applicable to ineffective assistance of counsel claims alleging a deficiency of attorney performance at noncapital sentencing proceedings. *Hernandez*, 988 S.W.2d 770, 772. Therefore, to the extent that appellant relies upon the standard in *Duffy*, we decline to follow his contentions and apply the *Strickland* standard to both the guilt-innocence and punishment stages of trial. *See id.*

In support of appellant's claim that his trial counsel failed to investigate and call witnesses on his behalf, appellant relies on the witness testimony previously summarized and on affidavits presented with his motion for new trial. However, both of appellant's trial counsel testified at the hearing that appellant specifically requested that he did not want any of the potential witnesses he had named to be subject to cross-examination. Appellant disagrees and in his affidavit states that he provided his trial attorneys with the names of many witnesses who could have testified on his behalf and did not understand why his attorneys would not interview them.

▉▉▉▉ The reviewing court must indulge a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. The appellant must overcome the presumption that, under the circumstances of the case, the contested actions may be considered sound trial strategy. *Id.* Strategic and tactical decisions are virtually unchallengeable when made after thorough investigation of the facts and law. *Id.* "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. at 2066.

Appellant's former trial counsel prepared for appellant's case by interviewing appellant twenty times in person and numerous times over the phone. The attorneys interviewed appellant's roommate and decided that it would be harmful to the defense if Bolanos testified. Both attorneys reviewed the entire State's file consisting of witness statements, police records, CPS records, grand jury summaries, appellant's school records, medical records for J.S., and divorce records.

Appellant's former counsel also testified that the decision not to call appellant's suggested witnesses was a strategy decision made by counsel and appellant so that they could avoid exposing the witnesses to cross-examination and "have you heard" questions concerning extraneous offenses. At guilt-innocence, impeachment questions concerning the allegations of abuse in El Salvador and by A.J. could have been particularly damaging to appellant's case.

The decision by appellant's trial counsel not to call the potential witnesses during the guilt-innocence phase of trial was

based upon sound trial strategy. Moreover, there was no need for appellant's trial counsel to interview additional character witnesses for the guilt-innocence phase because counsel and appellant had decided not to expose any of the potential witnesses to cross-examination. Appellant has not overcome the presumption that, under the circumstances, the decision not to investigate witnesses further might be considered sound trial strategy. Thus, we hold that the performance of appellant's trial counsel was not deficient during the guilt-innocence phase of trial. Having held that counsels' performance was not deficient under the first prong of *Strickland,* we need not reach the second prong with regard to the guilt-innocence phase of trial.

### Punishment Phase of Trial

 As we noted above, the court of criminal appeals in *Hernandez v. State* extended the *Strickland* test to apply to ineffective assistance of counsel claims at the punishment phase of trial in non-capital cases. *Hernandez,* 988 S.W.2d at 772. With regard to the punishment phase of trial, appellant argues that Maurice, the co-worker in El Salvador, could have testified about appellant's activities there. However, appellant ignores the fact that Maurice was not with him at all times while he was in El Salvador. Although Maurice could testify regarding his observations of appellant innocently interacting with the children while in Maurice's presence, he was without personal knowledge about the specific circumstances surrounding the allegations of abuse. Additionally, Maurice was unable to provide an alibi or other explanation for the allegations of abuse.

Harrelson's testimony at the motion for new trial hearing contradicted Piatt's claim that appellant admitted fondling young boys in El Salvador. She claimed that she was present during the meeting and that appellant never made the admission as Piatt claimed he did. Harrelson's testimony also relates to the testimony of G.C. and the Johnsons in that she claims she personally saw appellant interact with G.C. and A.J. and that neither indicated that they were uncomfortable around appellant. However, Harrelson was not personally present during any of the instances of alleged abuse. The weight of Harrelson's testimony also must be weighed against the fact that she is appellant's mother and could have been impeached on the basis of bias or prejudice.

The proposed witnesses that appellant provided his attorneys were primarily character witnesses. The few who might have at one point provided information that could have been used for impeachment were no longer needed because the primary witness, J.S., admitted to lying. Specifically, J.S. admitted on the stand that he had sexually assaulted his younger brother and had lied about it on more than one occasion. Since he had admitted lying, any witnesses that could testify to the contradictory statements would not be needed.

Both of appellant's former trial attorneys testified that the decision not to call any witnesses to testify at the guilt-innocence and punishment stages were strategy decisions. Additionally, the attorneys and appellant decided that it was best if appellant did not testify on his own behalf because appellant was worried that he might say the wrong thing and open the door to issues that he did not want to come out. When asked during trial whether he would consider testifying, appellant unequivocally stated that he would not. With regard to character witnesses, appellant's trial counsel decided that instead of calling them to testify they would have the

witnesses submit affidavits to the officer conducting the Pre–Sentence Investigation. Appellant agreed to this strategy after a lengthy discussion with his attorneys because he was concerned that any witness that took the stand would be subject to cross-examination and possibly harm his case. Appellant clearly indicated to his counsel that he did not want any of his friends or family subject to cross-examination.

Because appellant decided to submit affidavits to the Pre–Sentence Investigation officer instead of calling witnesses and clearly indicated to his attorneys that he did not want any of his proposed witnesses subjected to cross-examination, the decision by appellant and his trial counsel not to call the potential witnesses during the punishment phase of trial was based upon sound trial strategy. Moreover, there was no need for appellant's trial counsel to interview additional character witnesses for punishment because counsel and appellant had decided not to expose any of the potential witnesses to cross-examination. Appellant has not overcome the presumption that, under the circumstances, the decision not to investigate witnesses further or call them during the punishment phase was sound trial strategy. Thus, we hold that the performance of appellant's trial counsel was not deficient during the punishment phase of trial. Having held that counsels' performance was not deficient under the first prong of *Strickland*, we need not reach the second prong. Accordingly, we overrule appellant's first point.

## EXCLUSION OF EVIDENCE

■ In his second point, appellant complains that the trial court erred by excluding evidence that J.S. and R.D. had been having sex with each other prior to the alleged assault committed by appellant. Appellant argues that the State opened the door to this line of evidence. As set out above, R.D. testified about the phone call from J.S.'s mother where they discussed the allegations against appellant. The conversation demonstrated that neither J.S. nor R.D. told anyone about the abuse until after J.S. was caught sexually assaulting his three-year-old brother.

On direct examination, R.D. stated that J.S.'s mother called while very upset and "she ... asked ... about the nights that— at [appellant]'s and about things that happened between [J.S.] and I and what was happening and stuff." Outside the presence of the jury, the defense elicited testimony from R.D. that sexual activity was going on between his stepbrother (J.S.) and himself. Specifically, he said that he and J.S. were having oral sex and were doing "penises to the buttocks-type stuff" with each other for years. R.D. also confirmed that J.S.'s mother had indeed asked him about what was going on between he and J.S. The trial court excluded the proffered testimony.

■ At trial, appellant argued that the excluded evidence, including the evidence of the victims' prior sexual conduct, was admissible under the rules of evidence to show the victims' motive to lie. As an appellate court, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996), *cert. denied*, 520 U.S. 1200, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997); *Montgomery v. State*, 810 S.W.2d 372, 379–80 (Tex.Crim.App.1990). Therefore, we will not reverse a trial court as long as its ruling was within the "zone of reasonable disagreement." *Green*, 934 S.W.2d at 102; *Montgomery*, 810 S.W.2d at 391 (op. on reh'g).

Appellant argues that this evidence was relevant as an alternative basis of information to explain how J.S. and R.D. were

so knowledgeable about sexual matters. Because the average child would not be expected to explain sexual matters so explicitly, appellant argued that without information concerning sexual conduct between J.S. and R.D., the jury would infer that the boys could not have known about these sexual acts unless appellant performed them on the boys. The trial court held that the evidence was irrelevant and denied appellant's request.

On appeal, the State argues that this evidence was inadmissible under rule 412 of the Texas Rules of Evidence, the rape shield statute. This rule excludes evidence of specific instances of an alleged victim's past sexual conduct in a trial for aggravated sexual assault unless the evidence falls within one of several enumerated categories set out in rule 412(b)(2). Tex.R. Evid. 412(b)(2). Evidence of specific instances of an alleged victim's past sexual behavior is only admissible if it is evidence (1) to rebut or explain scientific or medical evidence offered by the State, (2) of past sexual behavior with the accused, offered on the issue of consent, (3) that relates to the motive or bias of the alleged victim, (4) that is admissible under rule 609, or (5) that is constitutionally required to be admitted. *Id.*

No evidence in the record, or offered outside the jury's presence, suggests that the boys were biased or motivated to lie about the assault. Additionally, the vague reference to sexual conduct between R.D. and J.S. during the testimony of R.D., where he stated that J.S.'s mother had called him to ask about "things that happened between [J.S.] and I and what was happening and stuff," cannot be construed as opening the door to otherwise inadmissable evidence. The trial court stated in the record that it believed that R.D.'s testimony did not specifically refer to conduct between R.D. and J.S.

A number of states have held that the United States Constitution compels the admission of evidence to show an alternative basis for a child victim's knowledge of sexual matters. *See, e.g., State v. Dodson,* 219 Wis.2d 65, 580 N.W.2d 181, 191 (1998); *State v. Budis,* 125 N.J. 519, 593 A.2d 784, 791 (1991); *Commonwealth v. Ruffen,* 399 Mass. 811, 507 N.E.2d 684, 688 (1987); *State v. Howard,* 121 N.H. 53, 426 A.2d 457, 462 (1981). The constitutional provisions most often implicated in cases of this type are the Sixth Amendment right of confrontation and the Fourteenth Amendment due process right to a fair trial. *See State v. Clarke,* 343 N.W.2d 158, 161 (Iowa 1984). The Constitution requires, however, only the introduction of otherwise relevant and admissible evidence. *See United States v. Nixon,* 418 U.S. 683, 711, 94 S.Ct. 3090, 3109, 41 L.Ed.2d 1039 (1974). Thus, before evidence of an alleged victim's sexual behavior may be admitted under rule 412(b)(2)(E), the defendant must first establish the relevancy of the evidence to a material issue in the case. Tex.R. Evid. 401. If the evidence is not relevant, it is not admissible. *See* Tex.R. Evid. 402. To show the relevancy of a child victim's prior sexual conduct as an alternate source of sexual knowledge, the defendant must establish that the prior acts clearly occurred and that the acts so closely resembled those of the present case that they could explain the victim's knowledge about the sexual matters in question. *See State v. Pulizzano,* 155 Wis.2d 633, 456 N.W.2d 325, 335 (1990).

At trial, appellant's counsel elicited R.D.'s testimony outside the presence of the jury and told the trial court that the evidence should come in to show that the boys got caught with each other and to get the heat off themselves they pointed the finger at appellant. The State objected to

the testimony as irrelevant and inadmissible under rules 412 and 608(b). Tex.R. Evid. 412, 608(b). The trial court conjectured that the door could be opened if an expert testified that the boys would not have known about the sexual acts but for appellant's actions. However, without the expert testimony, the trial court stated that the evidence was not relevant and that the door was not opened by the testimony as presented. Moreover, the trial court surmised that even if the testimony was somewhat relevant, it was more prejudicial than probative. *See* Tex.R. Evid. 403.

 Appellant also cites the testimony of Brandon Williams as opening the door to evidence on the sexual relationship between J.S. and R.D. During Williams's conversation with appellant where he informed appellant of the allegations of sexual abuse, appellant told Williams that one evening while the boys were at his home, he heard them making some noise and when he went to investigate he saw the boys "messing with each other" or "playing with each other." Appellant argues that this testimony put into issue the question of whether or not J.S. and R.D. were in fact "messing with each other." Appellant contends that the testimony left the jury with a misimpression that appellant was lying in order to cover himself. We disagree.

Appellant did not establish the relevancy of the evidence as a material issue in the case so as to justify admission of evidence of an alleged victim's sexual behavior under rule 412(b)(2)(E). Tex.R. Evid. 401, 412(b)(2)(E). Appellant did not establish that the prior acts clearly occurred, nor did he prove that the acts so closely resembled the acts alleged against appellant that they could explain the victims' knowledge about the sexual matters in question. *See Matz v. State,* 989 S.W.2d 419, 422 (Tex.App.-Fort Worth 1999), *rev'd on other grounds,* 14 S.W.3d 746 (Tex.Crim.App. 2000). Thus, we overrule appellant's second point.

## CONCLUSION

Having overruled both of appellant's points, we affirm the judgments of the trial court.