IN THE COURT OF
CRIMINAL APPEALS

                                   OF
TEXAS

 

                                                                              

                                                               NO.
PD-1314-05



 

 

                                              H. F. WESTERMAN, JR., Appellant

 

                                                                             v.

 

                                                        THE
STATE OF TEXAS

 



                         ON
STATE=S
PETITION FOR DISCRETIONARY REVIEW

                                      FROM
THE TENTH COURT OF APPEALS

                                                         McLENNAN  COUNTY



 

Cochran,
J., delivered the opinion of the unanimous Court.

 

                                                                  O
P I N I O N 

 








A jury convicted seventy‑year‑old
H. F. Westerman, Jr., the elected Constable of Precinct 3 in Falls County, of
indecent exposure for masturbating in his truck in an H.E.B. parking lot.  Appellant
filed a motion for new trial, claiming that his attorney had provided
ineffective assistance of counsel because he failed to interview or call a
corroborating witness or character witnesses.  The trial judge denied appellant=s motion after a hearing in which
appellant=s counsel testified and explained his strategy for not calling the
witnesses.  A majority of the Waco Court of Appeals held that the trial judge
abused his discretion in denying appellant=s claim.[1]  
The State asks whether the court of appeals applied Strickland v. Washington[2]
correctly in analyzing appellant=s ineffective assistance claim.[3]  
We find that it did not, and we therefore reverse the court of appeals.

I.








Heather Reyna,[4]
a Waco resident and owner of a real estate company, testified that she went
grocery shopping at H.E.B on June 26, 2003, at about 5:00 p.m.  She parked
right up front.  An Aolder, beat up@ camper truck was parked face-to-face
with her Jaguar.  She noticed a man, later identified as appellant, sitting in
the passenger seat.  Ms. Reyna did her shopping and then walked back to her car
with her bags about twenty minutes later.  She noticed that appellant was still
sitting in the passenger seat of the truck.  She had to step up onto the curb
to get to her car.  She said, AAs I walked up the curb, I noticed that [appellant] had his
underwear pulled down with one hand and was masturbating with his other hand.@  Ms. Reyna said he was looking out
his window to where Athere was some kids and a lady walking.@  She said that she had A[n]o doubt at all@ that appellant was masturbating.

Ms. Reyna quickly got in her car and
decided to call 911 Abecause this is not the right place.@  She backed out, drove to the edge
of the parking lot, and called 911.  The operator asked her for a description
of the truck and its license plate number.  Ms. Reyna, still watching the
truck, noticed that appellant Acrawled out of the passenger seat, and crawled into the
driver=s seat, put on his hat, put on his
seat belt, and he backed up.@  Ms. Reyna, trying to get the license plate number, followed
as appellant drove across the street to the Target parking lot.

According to Ms. Reyna, when
appellant noticed her following him, he drove out of the Target lot.  She
followed.  When appellant came to a red light, he saw that she was still behind
him, so he ran the light.  Ms. Reyna followed, also running the red light and
still on the phone to 911.  When the police pulled appellant over, Ms. Reyna
stopped as well and gave the responding officer a written statement.  She
testified that she called 911 because Ato be parking out on the front row,
in the very front row, doing that kind of stuff, I just feel like [that] should
be something that you do elsewhere besides in public.@








Officer Andy O=Neill testified that he was
dispatched to find Ms. Reyna who was following appellant=s truck.  He testified that he Apulled in between the silver Jag and
the truck to pull the vehicle over, and the silver Jaguar pulled in the parking
lot behind us.@ According to Officer O=Neill, appellant was completely dressed and also had on a
badge, a pistol in a leather holster, and a cowboy hat.  When Officer O=Neill told him why he had been pulled
over, appellant just said it Ahadn=t happened.@  Appellant did not say anything about having had an upset
stomach, and Officer O=Neill did not see any Pepto-Bismol bottle. Officer O=Neill saw nothing out of the ordinaryBno tell-tale evidence of recent
masturbation, no Anapkins in the floorboard, in the seat, . . . any kind of
pornographic material, magazines, anything like that, clothes being undone,
belts being unbuckled, things like that.@  He let appellant go, and he took a
statement from Ms. Reyna.  Then she, too, went on her way.  The State rested
its case.

Appellant testified that he drove to
Waco to meet his friend, Peggy Hendrix,[5] to play
bingo.  They were to meet at Target.  When he got to Waco, he went to the
Target first, but he didn=t see Ms. Hendrix=s van.  He then went to the H.E.B.
because he needed to use the restroom.  After using the restroom, he pulled out
of his parking spot and started to exit the lot, but then Athe urge hit@ him again.  He had Adiarrhea something fierce that day.@  He re-parked, this time right up
front and went back in the H.E.B.

He testified that he bought a bottle of
Pepto-Bismol and got in on the passenger side: AWhat I had done when I got back in
the pickup, I loosened my belt, undone it, and I took my weapon off.@  He said he then sat in his truck
for 15 to 20 minutes, Asitting there, staring off in space most of the time,@ waiting for his upset stomach to
settle down.








When asked whether he ever had his
penis in his hand appellant replied, ANo, Sir.  I had that bottle of
Pepto-Bismol between my legs, and I was shaking it up and down like that, for
maybe two or three seconds.@  He also denied that his clothes were ever loose enough that
Ms. Reyna could have seen his underwear.  He added that Aas big as my stomach is, I don=t think she could have seen me.@  After he started feeling better, he
Acrawled over, just like she said@ to the driver=s side, started up his truck, and
left.  He then returned to the Target to look for his friend=s van, which wasn=t there.  He started towards the
bingo hall because the backup plan was to meet there at 5:00.

Appellant said that, before he
reached the bingo hall, AI looked behind me, and it looked like the whole city of Waco
was lit up with police cars.@  Appellant described the stop as being very short, and,
after Officer O=Neill let him go, he went to the Dairy Queen to get a milk
shake.  Then he waited in his truck at the bingo hall for his friend Peggy, who
arrived a few minutes later.  Appellant testified unequivocally that he never
noticed Ms. Reyna at the H.E.B., never noticed that she was following him in
her Jaguar, did not run a red light (it might have been yellow), and never
exposed himself in the H.E.B. parking lot.








On cross-examination, the prosecutor
asked whether Peggy, appellant=s friend, was Ahere today to confirm this story.@  Appellant said no.  When asked why
he didn=t say anything about not feeling well
to Officer O=Neill, appellant said he didn=t have much of a chance to say
anything because, after Officer O=Neill brought his identification
back, he told him he was free to go, Aso I took it at that.@  Asked whether he told Peggy about
the whole incident, he said, ASure did.  Yes, ma=am.@  The prosecutor then asked a
rhetorical question:  AOkay.  And she=s not here today?@  On re-cross-examination, the State
again asked about Peggy:  AShe wasn=t there at that time this happened, right Mr. Westerman? . .
. But sheBshe certainly could say that y=all had decided to meet at Target two
days before.  Right?@

In closing, the prosecutor argued
that appellant=s story was Aabsolutely unbelievable and unreasonable.@  The defense attorney reminded the
jury that Asometimes what people see isn=t necessarily the case.@  He also reminded the jury that
Officer O=Neill did not arrest appellant because he did not see anything out of the
ordinary when he pulled appellant over.  Nevertheless, the jury found appellant
guilty of indecent exposure.  The trial court sentenced him to 120 days= confinement, probated for eighteen
months, and a $2,000 fine, with $1,800 probated for eighteen months. Appellant
filed a motion for new trial, alleging ineffective assistance of counsel, but,
after an evidentiary hearing, the trial judge denied that motion.

The court of appeals found that trial
counsel=s failure to interview or call Peggy
Hendrix prejudiced appellant. First, the court found deficient performance:  AWesterman testified that [Ms.
Hendrix] was available for trial, and [Ms. Hendrix]=s statement indicates her testimony
would have been helpful. Therefore, we find that trial counsel was deficient in
failing to conduct a proper investigation of the trial and interview potential
witnesses.@[6]  Second, the court found prejudice:

Three people testified at Westerman=s trial: Reyna, a police officer, and Westerman. The
officer could neither confirm nor deny the indecent exposure, therefore the
outcome of the trial balanced upon the credibility of Reyna and Westerman. The
State noted more than once that [Ms. Hendrix] had not been called to testify
for Westerman.








According to her statement, [Ms. Hendrix] would have
corroborated significant parts of Westerman=s
version of the events. Given that the trial hinged on credibility, and that the
State emphasized that no one was there to corroborate Westerman=s testimony, we cannot say that had [Hendrix] been
interviewed and called to testify at trial the outcome of the trial would not
have been different.[7]

 

The court of appeals reversed
appellant=s conviction and remanded the case for a new trial.

II.

An appellate court reviews a trial
court=s denial of a motion for new trial
under the Aabuse of discretion@ standard.[8]  In reviewing
the trial court=s ruling, an appellate court Amust view the evidence in the light
most favorable to the trial court=s ruling and presume that all
reasonable factual findings that could have been made against the losing party
were made against that losing party.@[9]  As the factfinder, the trial judge
has Athe right to accept or reject any
part of@ a witness=s testimony.[10] 
Thus, a trial court abuses its discretion in denying a motion for new trial
only when no reasonable view of the record could support its ruling.








The legal principles that govern
claims of ineffective assistance of counsel were set out by the Supreme Court
in Strickland v. Washington:  AAn ineffective assistance claim has
two components:  A petitioner must show that counsel=s performance was deficient, and that
the deficiency prejudiced the defense.@[11]   To establish deficient
performance, the defendant must demonstrate that his attorney=s representation Afell below an objective standard of
reasonableness.@[12]  The Supreme Court Adeclined to articulate specific
guidelines for appropriate attorney conduct and instead [has] emphasized that >the proper measure of attorney
performance remains simply reasonableness under prevailing professional norms.=@[13]








When addressing the specific question
of counsel=s duty to investigate the facts and interview or call potential
witnesses, the Supreme Court has stated that courts must Aconduct an objective review of
[counsel=s] performance, measured for >reasonableness under prevailing
professional norms,= which includes a context-dependent consideration of the
challenged conduct as seen >from counsel=s perspective at the time.=@[14]  That is, the reasonableness of  an
attorney=s pretrial investigation into
possible exculpatory evidence and witnesses depends upon the facts known by or
available to counsel at the time he made the decision whether to conduct
further investigation, interview potential witnesses, or call them to testify. 
Reviewing courts cannot indulge in Monday-morning quarterbacking or
second-guessing informed by hindsight or later developments.

III.

In this case, appellant=s claim of ineffective assistance
stems from counsel=s decision to limit the scope of his investigation by failing
to contact Peggy Hendrix, who could have corroborated parts of his trial
version of events, and by failing to present character witnesses.  A counsel=s failure to call witnesses is
irrelevant absent a showing that such witnesses were available and that appellant
would benefit from their testimony.[15] 

At the hearing on the motion for new
trial, appellant testified that before trial, both he and his trial counsel
understood that the case was going to boil down to which witness the jury would
believeBMs. Reyna or appellant.  Appellant
said that he told his attorney that Ms. Hendrix, the woman he was to meet and
did meet the night of the alleged offense, was available and willing to testify
on his behalf.  His attorney told him that Ait wouldn=t help.@  He also told his attorney of Aat least 12 or 15 people@ who would have been willing to
testify on his behalf at punishment.  Again, his attorney said that he Adidn=t think it would help.@  








Appellant repeatedly testified that
he Anever discussed the case@ with his attorney.  He did not
discuss possible defenses with his attorney, and they never talked about
strategy.  He  said that he had not told his attorney different stories about
what had happened:  AI never had told him nothing that had happened except what I
was charged with.  That was the only thing that he ever discussed with me, what
the charge was.@ 

Appellant said he told his attorney
about the character witnesses Asitting in here before the trial,@ but his attorney said, AThe less people we have, the better
off we=ll be.@  At the new trial hearing, appellant
offered Defendant=s Exhibit 1Btwelve character reference letters, including one from
Sheriff KirkBand Defendant=s Exhibit 2Ba post-trial statement from Peggy Hendrix that corroborated
portions of appellant=s trial testimony.  She stated that she and appellant were
friends and bingo partners, and that on June 26th, she had arranged
to meet appellant before bingo at either the Target, Dollar Store, or H.E.B.
parking lot.  She said that she was late and ended up meeting him instead at
the bingo hall.  She stated,

He came in and he looked really
sick.  We usually play Bingo several days during the week and this day he felt
worse than he ever did.  He told me that he went back to his car and shook the
bottle up before drinking half the bottle.  He showed me the bottle and I told
him that he probably didn=t need to drink anymore.  He told me that he got pulled over
in the Bingo parking lot by a policeman.  He went on saying that the policeman
told him told him there was a complaint made by a woman that saw him in the
parking lot of HEB expos[ing] himself.  I couldn=t believe what he was saying because
it didn=t sound like anything he would have
done.  I know that he was very sick that night because while we were at the
Bingo place he had to go to the bathroom throughout the night.  I ended up
having to play his Bingo cards for him.[16]








Appellant=s trial attorney then testified and
explained that the first time he talked to appellant about the charge,
appellant Awas laughing and said that he was eating a hot dog, that maybe she saw
the wiener.@  Later, he learned from the prosecutor that appellant had told Sheriff
Kirk that he had taken a Anature pee@ in a bottle, because he could not get to the restroom in
time.[17]  Then,
shortly before trial began, appellant told counsel that he had had an upset
stomach and that maybe Ms. Reyna had seen him shaking the Pepto-Bismol bottle. 

Appellant=s attorney explained that he did not
call appellant=s character witnesses Abecause that would have been suicide.@[18]  Specifically, he did not call
Sheriff Kirk because the sheriff had expressed concern about the disparity
between the allegations and the Anature pee@ story that appellant had told him. 
Counsel did not want Sheriff Kirk or any other witness on the stand Abecause I didn=t know what all [appellant] had told
them or what the sheriff had told people . . . I felt that Mr. Westerman, he
looks credible to me, and I felt that B that would be suicide to call
someone, not knowing what they are going to say.@[19]








 Appellant=s attorney likewise explained that he
did not want to call Peggy Hendrix because Aall she could testify to was that he
was supposed to meet her, and that when he finally saw her after he had been
stopped, that he had an upset stomach.@  He thought her testimony would not
be relevant (because it corroborated only events before and after the alleged
offense) or admissible (because what appellant told her about the events in the
H.E.B. parking lot was hearsay). 

Most important, counsel stated that
his strategy was based on appellant=s second version of facts:  he had Aa nature pee.@  Thus, the defense would assume that
appellant had possibly exposed himself and that Ms. Reyna had seen this exposure. 
But the exposure was done not for sexual gratificationBit was simply to relieve himself and
his upset stomach.  Appellant was the only witness needed.  The fact that Ms.
Reyna did see his penis could be conceded, but the defense would clarify that
there was nothing sexual about the exposure.  There would be no AHe said, she said@ credibility battle.  Ms. Reyna saw
what she said she saw, but the defense had a plausible explanation for what she
saw.  Then appellant surprised his own counsel with his unexpected testimony
that he never pulled down his underwear[20]
and never exposed his privates:








I felt that the element that was going to be in issue
was if a person exposes himself, if it=s
for a sick stomach or something like, it=s
not criminal; but if it=s for sexual gratification, it=s criminal.  And the way I understood it from talking
to Mr. Westerman was that if she saw his penis, it=s because he had a sick stomach, you know, he was
taking care of himself; and if she saw his hand shaking, it was because he was
probably shaking a bottle of Pepto-Bismol.  But when he took the stand and [the
prosecutor] cross-examined him, he committed himself, that there=s no possible way that Ms. Reyna saw his penis, that
his pants were pulled up, it wasn=t a
question of did she see it because of sexual gratification versus he had as
sick stomach; it=s a question of did she see his penis at all.  It
changed the whole complexion of it.

 

Here, counsel justified his limited
investigation into Ms. Hendrix and the character witnesses as both strategic
and tactical judgments.  He would not call Ms. Hendrix because she could
testify only to collateral mattersBthat they were supposed to meet, they
did meet, and he had a sick stomach.  She could not testify to what appellant
had told her because that was inadmissible hearsay.  As counsel believed that
the only contested issue would be appellant=s intent and Ms. Hendrix=s testimony was irrelevant to that
issue, her testimony could only detract from that defense by creating possible
testimonial conflicts about collateral issuesBwhere they were to meet, when,
appellant=s appearance at the bingo hall, the Pepto-Bismol bottle, etc.  He did not
call the character witnesses because he himself had been told three different
stories about what had happened, and he knew that at least one of the character
witnesses had been also.  He did not want to open a Pandora=s box for the State=s cross-examination; he wanted to
focus on the viable defensive strategy of innocent intent that he thought
appellant=s second version of facts established.








In light of the legal standards set
out in both Strickland and Wiggins, our principal concern in
deciding whether counsel exercised Areasonable  professional judgment,@ is not whether, in light of
appellant=s actual trial testimony, he should have called Ms. Hendrix or the
character witnesses.  Rather, we focus on whether the investigation supporting
counsel=s decision not to interview or call
them was itself reasonable at the time he made that decision.  That is, A>Every effort [must] be made to
eliminate the distorting effects of hindsight.=@[21]  

The record at the
motion-for-new-trial hearing supports the trial court=s ruling that counsel=s decision not to interview or call
Ms. Hendrix was within the range of reasonable professional judgment. 
According to counsel, appellant had already told him what Ms. Hendrix could
corroborate,[22] so
interviewing her would not have uncovered any new informationBa fact borne out by her affidavit,
and one not contested by appellant.  Counsel set out the defense when he
previewed appellant=s expected testimony in his opening statement:

He needed to use the rest room.  His stomach, I think
he=s going to testify, was somewhat upset . . . .  I
think he=s going to testify that his pants were undone, and
that he went ahead and brought them down lower so it wouldn=t cramp his stomach that much more.  And he would
drink the Pepto-Bismol, and he looked out the window, trying to get over what
he hadBor at least where he wouldn=t have bouts of diarrhea. . . .  I think he=s going to testify that if the lady saw his private
part, it wasn=t because he was trying to expose himself for sexual
gratification.  If she did see it, it=s
because he was trying to keep himself from having diarrhea . . . .

 








Because the jury would not be faced
with any dilemma of deciding who was Alying,@ counsel rationally decided that a
witness who could corroborate only collateral matters was not helpful and, in
fact, might contradict other anticipated testimony.  But appellant=s stance on the stand turned the
trial into a Ahe said, she said@ affair.  Counsel could not have predicted this.  As the
State notes, AAppellant himself took away the defense that he and counsel intended to
present and after-the-fact he wants to complain that counsel was not prepared
to corroborate the defense he created on the stand.@[23]  On appeal, appellant wants counsel=s decision reviewed with the
distorting effects of hindsight based upon what counsel testified was appellant=s unexpected trial testimony.  This
is exactly the kind of Monday-morning quarterbacking that the Supreme Court
denounced in Strickland.  

Nor was counsel=s failure to interview or call the
character witnesses unreasonable. First, it appears that appellant did not tell
counsel of any potential character witnesses until the morning of trial. 
Second, because of appellant=s various stories about what had happened, and the fact that
the defense was to focus on intent rather than credibility, counsel=s decision to let his clientBan elected law enforcement officialBstand on his own reflected  Areasonable  professional judgment.@   An elected constable comes cloaked
with the credibility of the electorate; counsel need not assume that his client=s testimony would necessarily place
his character for truthfulness into question.  And third, as the trial court
noted, their testimony would not have been admissible at the guilt stage
because none of them explicitly attested to appellant=s character for truthfulness.








We must view the facts in the light
most favorable to the trial judge=s ruling.  He was  in a much better
position to judge the credibility of the witnesses at the new trial hearing and
to gauge the potential impact of any additional defense witnesses who might
have been called during the trial.  At the motion-for-new-trial hearing, the
judge was required to assess the different versions given by appellant and his
counsel.  The court of appeals failed to give  credence to counsel=s explanations, but the trial judge
may have made a different assessment.  He was entitled to do so.[24] 
Reviewing courts must defer to those credibility assessments.  Further, the
trial court was not required to accept Ms. Hendrix=s post-trial statement uncritically.[25] 
Although the court of appeals aptly noted that, during her closing argument,
the prosecutor made much of the fact that appellant failed to call Ms. Hendrix
to corroborate his story,[26] this became
an issue only because appellant unexpectedly turned the trial into a
credibility contest.  








The court of appeals cited several
cases for the proposition that an Aattorney has a duty to make an
independent investigation of the facts supporting a defense,@ and to Apresent all available testimony in
support of the client=s defense.@[27]  In those cases, unlike the present
one, the failure to investigate was central to the presentation of a known and
viable defense.  In three cases cited by the court of appeals, for example, the
available witnesses that were not called had information that went to the very
heart of the case.[28]

This case, however, is more like Hale
v. State,[29] in which Aappellant=s trial counsel failed to interview
potential witnesses who could have testified favorably for appellant during the
trial@ but 








[n]one of appellant=s
potential witnesses had any personal information concerning the accusations
made by the two victims. None of appellant=s
proposed witnesses could provide an alibi or an eyewitness account of what
occurred between appellant and the victims. At best, some of the witnesses
could offer testimony on their personal observations of appellant interacting
with the victims on other occasions and statements to the effect that nothing
inappropriate occurred while the witnesses were present.[30]

 

In this case, as in Hale, none
of appellant=s potential witnesses had any personal information concerning Ms. Reyna=s accusations.  None could provide
any account of what occurred at the H.E.B.  At best, Ms. Hendrix could have
testified that she and appellant had arranged to meet, they did meet, and she
made personal observations of appellant later that same day.  Although Ms.
Hendrix could have corroborated appellant=s testimony on some collateral
matters, the trial judge knew from reading her post-trial statement that Ms.
Hendrix=s testimony would have been
inconsistent with appellant=s testimony on some of these collateral matters also.  Ms.
Hendrix=s absence at trial did not, at any
rate, rob appellant of a viable defense.[31] 
The prosecutor repeatedly commented on Ms. Hendrix=s absence.  The trial judge, however,
may have concluded that, had Mr. Hendrix testified, the prosecutor would have
commented on the inconsistencies between appellant=s trial testimony and Ms. Hendrix=s factual statements (and might have
developed additional inconsistencies, just as defense counsel feared).

IV.








In sum, appellant did not overcome
the presumption that, under these circumstances, the decision not to
investigate further or call additional witnesses could be considered sound
trial strategy. This record does not support the court of appeals=s holding that the trial judge abused
his discretion in denying appellant=s motion for new trial.  Thus, we
reverse the court of appeals=s judgment and remand the case to that court to address
appellant=s remaining point of error.

 

Delivered:  September 20, 2006

Do Not Publish









[1]
Westerman v. State, No. 10‑04‑00292‑CR, 2005 Tex. App.
LEXIS 4842 (Tex. App.B
Waco 2005).





[2]
466 U.S. 668 (1984).





[3]
The State asks:  ADid
the court of appeals fail to follow established law when it found counsel
ineffective under both prongs of Strickland for failing to call one
particular witness without regard to counsel=s
trial strategy or the totality of the circumstances?@





[4]
In its Brief, the State asserts that AHeather
Reyna was Justice Reyna=s
[the author of the court of appeals=s
opinion] daughter-in-law at the time of the incident.@  This relationship is not established in the
record, however, so we do not consider it.  Chief Justice Gray recused himself
from participation in this case.





[5]
Hendrix is spelled AHendricks@ except in Ms. Hendrix=s handwritten statement,
admitted as Defense Exhibit 2 at the Motion for New Trial.





[6]
Westerman, 2005 Tex. App. LEXIS 4842, at * 7.





[7]
Id. at *8.





[8]
Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004); Lewis
v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995) (AIt is well established that the granting or
denying of a motion for new trial lies within the discretion of the trial
court.  We do not substitute our judgment for that of the trial court, but
rather decide whether the trial court=s
decision was arbitrary or unreasonable@).





[9]
Charles, 146 S.W.3d at 208 (footnote omitted).





[10]
Beck v. State, 573 S.W.2d 786, 791 (Tex. Crim. App. 1978).





[11]
Wiggins v. Smith, 539 U.S. 510, 521 (2003) (citing Strickland,
466 U.S. at 687). 





[12]
Id. (quoting Strickland, 466 U.S. at 688). 





[13]
Id. 





[14]
Id. at 522-23.  In Wiggins, the Court quoted its prior discussion
from Strickland concerning defense counsel=s
strategic choices: 

AStrategic
choices made after thorough investigation of law and facts relevant to
plausible options are virtually unchallengeable; and strategic choices made
after less than complete investigation are reasonable precisely to the extent
that reasonable professional judgments support the limitations on
investigation.  In other words, counsel has a duty to make reasonable
investigations or to make a reasonable decision that makes particular
investigations unnecessary. In any ineffectiveness case, a particular decision
not to investigate must be directly assessed for reasonableness in all the
circumstances, applying a heavy measure of deference to counsel=s judgments.@

Id. at 521-22 (quoting Strickland,
466 U.S. at 690-91).





[15]
King v. State, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983).





[16]
At trial, appellant said that he felt much better by the time he arrived at the
bingo hall.





[17]
At the motion-for-new-trial hearing, the prosecutor stated, for the record,
that this was exactly what Sheriff Kirk had told her.





[18] 
The judge stated at the motion-for-new-trial hearing that the only admissible
testimony from character witnesses at the guilt stage of the trial would be
testimony concerning appellant=s
character for truthfulness.  On the whole, the letters from the character
witnesses did not address his credibility, but rather stated that he was a Agood person,@ Aan upstanding gentleman,@ Anot capable of this act,@ did not have Athe characteristics of a
sex offender,@ was a Amoral, ethical man,@ noted that the charges Aare ludicrous,@ stated that appellant
would Anever display
such a disrespectful and offense [sic] act,@
although one said that he was Aa
person of honesty, integrity, and unquestionable morality.@





[19]
Both appellant and his counsel testified that appellant raised the topic of
character witnesses when they were in the courtroom awaiting the jury panel.





[20]
At the motion-for-new-trial hearing, appellant testified that he had Athrown away@ his underwear at the
H.E.B., so Ms. Reyna could not have seen it pulled down.





[21]
Wiggins, 539 U.S. at 523 (quoting Strickland, 466 U.S. at 689)
(internal cite omitted).





[22]
Appellant, however, testified that he and his counsel never discussed the facts
of the case until the morning of trial; if that were so, counsel did not know
of Ms. Hendrix=s
existence in time to interview her.  The trial court was not required to credit
this or any other specific testimony at the post-trial hearing.





[23]
State=s Brief at 10.





[24]Beck
v. State, 573 S.W.2d 786, 791 (Tex. Crim. App. 1978) (noting that, at a
motion for new trial hearing, the trial judge has Athe right to accept or reject any part of@ a witness's testimony).





[25]
See Charles, 146 S.W.3d at 210 (noting that, Ain the context of the denial of a motion for
new trial, >[a]
deferential rather than de novo standard applies to our review of a trial court=s determination of
historical facts when that determination is based, as here, solely upon
affidavits= 
regardless of whether the affidavits are controverted@) (footnote omitted).





[26]
Westerman, 2005 Tex. App. LEXIS 4842 at *8 (AThe State noted more than once that [Hendrix]
had not been called to testify for Westerman@).





[27]
Id. at *7.





[28] 
In Butler v. State, 716 S.W.2d 48 (Tex. Crim. App. 1986), trial counsel
was deemed ineffective for failing to investigate a known alibi witness and
eyewitnesses who would have testified that the defendant was not the killer. 
Counsel had not contacted some of them, and articulated no trial strategy as to
why he did not use their testimony at trial.  Id. at 54-56.  In In
the Matter of I.R., 124 S.W.3d 294 (Tex. App.BEl
Paso 2003, no pet.),  defense counsel failed to subpoena a known alibi witness.
At the motion for new trial hearing, the alibi witness testified that the
juvenile defendant was with him and his family at a lake at the time he was
alleged to have been throwing rocks at another boy.  Counsel conceded that the
witness was Amaterial.@ Id. at 297.  And,
in State v. Thomas, 768 S.W.2d 335 (Tex. App.BHouston [14th Dist.] 1989, no
pet.), where the sole issue was whether the complainant consented to the
defendant=s sexual
act, and the evidence at the motion-for-new-trial hearing showed that the
defense of consent was not advanced because trial counsel failed to interview
and call certain witnesses who would say that the defendant and complainant had
an ongoing sexual relationship, the appellate court held that the trial court
did not abuse its discretion in granting the new trial.  Id. at
337. 

In all of these
cases, the record showed that (1) counsel failed to investigate or to call a
known and available helpful witness; (2) the failure was not the result of
reasonably professional judgment; and (3) the deficient conduct resulted in the
failure to advance a viable defense.  See also, Shelton v. State,
841 S.W.2d 526, 526-27 (Tex. App.BFort
Worth 1992, no pet.) (State=s
only evidence in retrial was the testimony of the sixteen‑year‑old
complaining witness; reversing conviction when defense counsel failed to
present the alibi testimony of the defendant=s
great niece, whose testimony at the first trial Aso
completely contradicted that of the complainant that it would have been
impossible for the jury to have believed both witnesses@; counsel=s
failure to secure the great niece=s
testimony robbed the defendant of his only viable defense); Jones v. State,
133 S.W.3d 307, 314-18 (Tex. App.BFort
Worth 2004, no pet.) (counsel=s
deficient conduct cause defendant prejudice when evidence at
motion-for-new-trial hearing showed that attorney failed to request a
continuance when alibi witnesses did not appear at trial and two of these
witnesses testified that the defendant was with them at time of robbery).            





[29]
140 S.W.3d 381 (Tex. App.BFort
Worth 2004, pet. ref=d).






[30]
Id. at 392‑93.





[31]
Compare, Butler, 716 S.W.2d at 54-56; In the Matter of I.R.,
124 S.W.3d at 297; Shelton, 841 S.W.2d at 527.