

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00108-CR

———————————————

JOSE AMAKAR ALVAREZ, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1773315

Before Sudderth, C.J.; Bassel and Womack, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Jose Amakar Alvarez of two counts of aggravated sexual assault of a child and three counts of indecency with a child by contact. In a single issue, Alvarez argues that the trial court abused its discretion by excluding evidence of the victim's sexual abuse by two other people. Because Alvarez failed to argue much less carry his burden to show that the probative value of the excluded evidence outweighed the danger of unfair prejudice, we affirm.

## II. Background

### A. Trial Testimony

The State presented the testimony of six witnesses,[1] and the defense put on one witness.

#### 1. The Forensic Interviewer

Martha Willis, who was formerly a child protective investigator in Kansas, met the victim, who was twelve years old at the time, while Willis was investigating a report of sexual abuse that the victim had disclosed. Willis conducted a forensic interview of the victim on June 6, 2018. During the interview, the victim identified Alvarez as her abuser. She believed that Alvarez was forty-seven years old at the time

---

[1]We omit the testimony of the State's final witness, the forensic interviewer supervisor at Alliance for Children, because she did not interview the victim but testified generally about forensic interviews of children, the variety of details that a child may or may not be able to recall, and the concept of grooming.

the incidents had occurred, stated that he was a maintenance worker at her apartment complex when she had lived in Arlington,[2] and said that he was also her mother's (Mother) friend.

The victim said that the first incident occurred in a car. Alvarez put his hand on her leg, came close to her, and kissed her mouth. The victim stated that she was not comfortable with that contact. The victim did not tell anyone about this incident near the time that it had occurred because she did not want to upset Mother.

The victim continued to go on car rides with Alvarez, and another incident occurred. During a time when it was dark, Alvarez pulled the car into a parking spot, leaned his chair back, unbuckled his pants, took his hand and put it down toward his penis, and forced the victim to suck his penis. The victim said that Alvarez had roughly pushed her head down on his penis; she was ten years old at the time. The victim said that it caused her to gag, that the gagging happened every time that she sucked his penis, that it was salty, and that she had tears in her eyes when she came up. Once this started (i.e., Alvarez's forcing the victim to suck his penis), it happened any time that they were alone in the car. The victim said that this happened "every two weeks, about three to four times a week."[3]

---

[2]The victim explained that she had moved to Emporia, Kansas, two years prior to the forensic interview.

[3]Willis was asked, "Was there an event that took place between the every two weeks and the three to four times a week?" She responded, "I'm not quite sure."

A separate incident occurred in the car when they went to Sonic. The victim said that Alvarez took her hand and put it under his clothes, directly on his penis. The victim described Alvarez's undergarments as tight boxers.

On one occasion, Mother asked the victim to take water to Alvarez while he was working in a nearby apartment. When the victim went to the apartment, Alvarez was on the ground working in the bathroom. She gave him the water, and he pulled her closer to him, kissed her on the mouth, and fondled her body.

A separate incident occurred when the victim and Mother ate lunch with Alvarez in the maintenance room at the apartment complex. The victim ended up sitting on Alvarez's lap, and as he spun the swivel chair in which he was sitting, he put his hand on her leg and slid it up towards her vagina area. The victim recalled that she could feel his erect penis while she was sitting on his lap.

A second incident occurred in the maintenance room. Mother told the victim to go tell Alvarez "hi." The victim ran into the maintenance room and said hello, and Alvarez pulled her close to him in a rough way, sat her on the table, and fondled her body. The victim said that when Alvarez moved his hands around her body, he touched her buttocks and her chest area.

The victim said that Alvarez abused her from the beginning of the school year until the following summer when she and her family moved. Before the victim moved from Arlington, Alvarez told the victim while they were in the car that he wanted to have sex with her.

The victim told Willis that she outcried because she was "really struggling emotionally" and had told a friend who had suggested that the victim go talk to someone. The victim explained that she had started self-harming, including cutting her arms, and that she had gone to her school counselor; she then became a client of a local therapist in Emporia. The victim said that she felt she needed to disclose the abuse because she needed that weight to be off her.

### 2. Mother

Mother testified that the victim was seventeen at the time of the trial. When Mother lived in Arlington in the fall of 2015, she lived in an apartment with her mom and stepdad, her three sons, and the victim.[4] Mother admitted that she became friends with Alvarez and that she later "became more like friends with benefits" and was in a relationship with him.[5] Mother really cared for Alvarez and was around him "[m]ost of the time." Mother said that Alvarez was nice to her children and treated them like they were his own. With regard to the victim, Mother testified that Alvarez was close to the victim and "would call her his princess because she was the princess. And he was very attentive towards her." Mother said that Alvarez took the victim on golf-cart rides and took her in his car (a gray Mazda with a spoiler) to get ice cream at Sonic once.

---

[4]Mother testified that the victim was eight years old at the time, but the record reveals that the victim was born in September 2005 and would have turned ten years old in September 2015.

[5]Mother admitted that Alvarez had a wife and kids at that time.

5

Mother recalled that the victim had been in the maintenance office when they ate with Alvarez there. Mother said that the victim was always around Alvarez and that she looked at him as a dad. Mother admitted that she had sent the victim by herself to deliver water to Alvarez when she saw him working across from their apartment.

Mother said that she moved from Arlington to Oklahoma City during the summer of 2016 because she had "met someone." Mother later moved to Emporia, Kansas, and kept in contact with Alvarez. When Alvarez would call Mother, he would ask for his princess, and Mother would give the phone to the victim. Mother last spoke to Alvarez in December 2016.

After the family moved to Emporia, Mother noticed changes in the victim's behavior. Mother said that the victim started self-harming, so Mother took her to therapy. It was while the victim was in therapy that Mother learned that Alvarez had sexually abused her. When the victim first told Mother that she had been sexually abused, she did not provide any details, only saying that she had been hurt.

### 3. The Detective

Detective George Alan Branch with the Arlington Police Department testified that the Arlington PD had received a report from an agency in Emporia, Kansas. Detective Branch was assigned the case on February 14, 2019, after another officer had previously worked on it.

Detective Branch received a copy of the victim's forensic interview, during which she revealed that the events had occurred in Arlington. The abuser (Alvarez) was dating Mother and was the maintenance man for the apartment complex where she lived. Detective Branch also reviewed the statement that the victim gave to law enforcement. After reviewing the forensic interview, Mother's statement, and the other detective's interview, Detective Branch sent the victim to get a medical exam in Kansas City.

Detective Branch spoke to Alvarez on July 30, 2019. Based on his driver's license, Alvarez was around forty-three years old at the time that he had abused the victim. The victim was ten to eleven years old during the time that the abuse occurred. Alvarez admitted that he knew the victim and said that he had a relationship with Mother. Alvarez said, "I can lie to you, but I cannot lie to God," which stood out to Detective Branch because it was an attempt to persuade him against what he was investigating (i.e., if Alvarez could persuade Detective Branch that he is a man of God and that men of God do not do these kinds of things, then Detective Branch would have no need to investigate him). Alvarez continually stated that he was being honest, which was a red flag to Detective Branch. During Detective Branch's investigation, he discovered that Alvarez had a gray Mazda with a spoiler on it registered to him around the time that he had abused the victim.

### 4.    The Nurse

Wendy Hartman, a forensic nurse at Wesley Medical Center in Wichita, Kansas, testified that she had the victim as a patient on October 14, 2019, due to a referral from Arlington PD. The victim was fourteen years old at that time. The victim said that Mother's boyfriend had touched her outside her clothes and made it sound like a one-time event. Hartman did not conduct a genital exam on the victim because she was "pretty uncomfortable just being there." Hartman felt that the victim "was done talking about it" and "didn't want to talk anymore about what [had] happened."

### 5.    The Victim

The victim, who was seventeen years old at the time of the trial, testified that she had previously lived in Arlington when she was approximately seven but had moved away when she was eleven. The victim said that she had met Alvarez when he was the maintenance man at the apartments in Arlington and that Mother was very good friends with him. The victim said that her biological father was not a part of her life, and she thought Alvarez was a good person because he was a "very good like fatherly figure." She stopped seeing Alvarez as a father figure when he started touching her.

The victim said that the first time something happened was when she was riding with him in his car (which she described as a grayish Mazda car) around the apartment complex; he put his hand on her thigh and put her hand on his thigh. She stated that "[a]fter the car rides, it got further." Alvarez started putting her hand on

his penis (over his clothes) and moving her hand to caress it. Later, there were times when he unzipped his pants and put her hand directly on his penis and moved her hand around. She recalled that he was wearing boxers. On other occasions, Alvarez took the victim for drives at night and parked by the dumpster at the apartments; he unzipped his pants and made her put her mouth on his penis. She explained that he used to get her finger and put it in his mouth to demonstrate how tightly she should put her mouth around his penis. She recalled that his penis tasted very salty and that she did not like it. She said that she would hold her breath in "a lot of times." When asked whether Alvarez could tell how uncomfortable she was, she replied affirmatively and said that she was "pretty tense" because she was by herself with a man who was clearly stronger than she was. When asked if she had ever gagged or had tears come to her eyes "because of what happened," she confirmed that she did. She said that her reactions did not seem to affect Alvarez at all and that he never stopped because of the effect that it was having on her.

The victim testified that Alvarez kissed her a lot; that he kissed her like he was in a relationship with her; and that it was "like a lot of tongue, very slobbery" and was disgusting.

When asked if Alvarez did different things when they went for a car ride during the day versus if they went at night, the victim responded affirmatively, stating that "[d]uring the day, things weren't that bad. Towards the night is when he would, like, be more touchy and more pushy."

The victim also recalled an incident that occurred in her apartment on an evening when her grandmother and Mother had invited Alvarez over for dinner. Alvarez put his hand under her underwear, and she felt his fingers in her vagina; she said that it stung. Alvarez told her that he wanted to put his penis inside of her "very soon."

The victim said that there was one incident that stood out in her mind when she could recall what she was wearing. During that incident, she was wearing her school uniform, and he rubbed up and caressed her. He touched her thighs and moved up her stomach and chest while kissing her a lot.

She had a specific memory of Alvarez's touching her chest. She said that her family was supposed to have dinner with him at the maintenance office, and he put her on the table with her legs apart and rubbed his penis against her vagina and stomach while kissing her. During that time, he touched her chest, and that made her feel very tense and was very confusing.

The victim testified about an incident that occurred on the couch in her family's apartment. She said that Alvarez was sitting on the couch and that her head was laying on his thighs and that she could feel his penis pushing on her head and back.

Alvarez told the victim that if she did not want him to go to jail, then she should not say anything. The victim testified that she did not want Alvarez to go to jail at that time because she saw him as a father figure. Additionally, the victim did

10

not tell Mother because "she was very happy around him," and the victim did not want to ruin that.

After the victim moved to Kansas, Alvarez called her and asked her to send him pictures of the underwear that she was wearing; she never did. The victim said that she had a boyfriend at the time and that Alvarez got very mad when she mentioned her boyfriend.

### 6. The Defense's Witness

During the defense's case in chief, Jose Torres, Alvarez's supervisor from the Arlington apartment complex, testified. He explained that the apartment complex had 660 units, that over 1,000 people lived there, and that there was lots of foot traffic. Torres said that Alvarez worked 8:00 a.m. to 5:00 p.m. and was not known to stay on the property after work. Torres testified that they were not allowed to give people rides in the golf carts that they used to get around the property for their job. On cross-examination, Torres said that he assigned tasks to the maintenance workers, that they went to various apartments to perform their assigned tasks, and that he was not always with Alvarez because he was supervising other jobs. Torres did not believe that Alvarez had committed any of the offenses for which he was charged because Torres never saw him commit them.

## B.	The Outcome

After hearing the testimony summarized above, the jury found Alvarez guilty of all five counts charged in the indictment.[6]  The jury assessed punishment at seventy

---

[6]The five counts as set forth in the indictment are as follows:

That . . . Alvarez, hereinafter called Defendant, on or about the 27th day of September 2015, in the County of Tarrant, State of Texas, did intentionally or knowingly cause the sexual organ of the Defendant to contact the mouth of [the victim], and [the victim] was younger than 14 years of age at the time of the offense,

Count Two:  And it is further presented in and to said court that the Defendant in the County of Tarrant and State aforesaid on or about the 27th day of September, 2015, did intentionally or knowingly cause the finger of the Defendant to penetrate the sexual organ of [the victim], and [the victim] was younger than 14 years of age at the time of the offense,

Count Three:  And it is further presented in and to said court that the Defendant in the County of Tarrant and State aforesaid on or about the 27th day of September, 2015, did intentionally, with the intent to arouse or gratify the sexual desire of any person, cause [the victim], a child younger than 17 years of age, to engage in sexual contact by causing [the victim] to touch any part of the genitals of the Defendant,

Count Four:  And it is further presented in and to said court that the Defendant in the County of Tarrant and State aforesaid on or about the 28th day of September, 2015, did intentionally, with the intent to arouse or gratify the sexual desire of any person, cause [the victim], a child younger than 17 years of age, to engage in sexual contact by causing [the victim] to touch any part of the genitals of the Defendant,

Count Five:  And it is further presented in and to said court that the Defendant in the County of Tarrant and State aforesaid on or about the 27th day of September, 2015, did intentionally, with the intent to arouse or gratify the sexual desire of any person, engage in sexual contact

years' confinement and a $10,000 fine on each count of aggravated sexual assault of a child and twenty years' confinement with no fine on each count of indecency with a child by contact. The trial court sentenced Alvarez in accordance with the jury's recommendations and ordered the sentences to run concurrently. This appeal followed.

### III. Failure to Carry Burden under Rule 412(b)(3)

In his sole issue, Alvarez argues that the trial court abused its discretion by excluding, under Rule 412 and the Confrontation Clause, evidence of the victim's previous sexual abuse by two other people. Alvarez contends that the exclusion of this evidence rendered him unable to develop his defensive theory. Alvarez argues that the evidence of the victim's sexual abuse by two others—C.P.[7] and Billy Gibbons—is relevant and material to establish the victim's knowledge of sexual matters and evidence of alternate perpetrators. Alvarez completely ignores that he had the burden to show that the probative value of such evidence outweighed the danger of unfair prejudice. Because Alvarez failed to argue much less carry his burden to show that the probative value of the excluded evidence outweighed the danger of unfair prejudice, which is a prerequisite to admitting such evidence, we cannot say that the trial court abused its discretion.

---

by touching the breast of [the victim], a child younger than 17 years of age[.] [Font altered from all caps for ease of reading.]

[7]We use initials because this perpetrator was a minor at the time that he committed the sexual offenses against the victim. *See* Tex. R. App. P. 9.8.

13

## A. Standard of Review

We review the admission or exclusion of evidence for an abuse of discretion, which occurs only when the ruling falls outside of the zone of reasonable disagreement. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). Given that standard, any ground or theory supported by the record may be used to affirm the ruling. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008).

## B. Applicable Law

With regard to the constitutional provisions that are implicated in cases in which a sexual-assault victim testifies, this court has previously stated,

> The constitutional provisions most often implicated in cases of this type are the Sixth Amendment right of confrontation and the Fourteenth Amendment due process right to a fair trial. The Constitution requires, however, only the introduction of otherwise relevant and admissible evidence. Thus, before evidence of an alleged victim's sexual behavior may be admitted under [R]ule 412(b)(2)(E), the defendant must first establish the relevancy of the evidence to a material issue in the case. If the evidence is not relevant, it is not admissible. To show the relevancy of a child victim's prior sexual conduct as an alternate source of sexual knowledge, the defendant must establish that the prior acts clearly occurred and that the acts so closely resembled those of the present case that they could explain the victim's knowledge about the sexual matters in question.

*Hale v. State*, 140 S.W.3d 381, 396 (Tex. App.—Fort Worth 2004, pet. ref'd) (citations omitted).

Moreover, we have recently explained how the Sixth Amendment right to confront witnesses intersects with Texas Rule of Evidence 412, which covers the admission of evidence of previous sexual conduct:

14

"The Sixth Amendment right to confront witnesses includes the right to cross-examine witnesses to attack their general credibility or to show their possible bias, self-interest, or motives in testifying." *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009) (citing *Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105[, 1110] (1974)). This right is not unqualified, and the trial judge has "wide discretion" to limit the scope of a defendant's confrontation right. *Id.* "Most questions concerning cross-examination may be resolved by looking to the Texas Rules of Evidence." *Id.*

Texas Rule of Evidence 412, known as the "rape shield" law, is one such rule. *Id.* at 566. It is designed to limit abusive, embarrassing, and irrelevant inquiries into a complainant's private life and to encourage sexual-assault victims to report those crimes. *See Dees v. State*, Nos. 02-12-00488-CR, 02-12-00489-CR, 2013 WL 6869865, at *6 (Tex. App.—Fort Worth Dec. 27, 2013, pet. ref'd) [(per curiam)] (mem. op., not designated for publication) . . . . "Rule 412 creates 'an extremely high hurdle' that the proponent of the proposed evidence must clear before the trial court may, in its discretion, admit specific instances of an alleged victim's past sexual behavior." *Rojas v. State*, No. 02-15-00144-CR, 2016 WL 6648748, at *3 (Tex. App.—Fort Worth Nov. 10, 2016, pet. ref'd) (mem. op., not designated for publication) (citing *Todd v. State*, 242 S.W.3d 126, 129 (Tex. App.—Texarkana 2007, pet. ref'd)).

Under Rule 412, specific instances of a victim's past sexual conduct are admissible only if three conditions are met. Tex. R. Evid. 412(b). First, once the defendant informs the court outside the jury's presence that he wants to introduce the evidence or ask questions about the complainant's past sexual behavior, the trial court must "conduct an in camera hearing, recorded by a court reporter, and determine whether the proposed evidence is admissible." [Tex. R. Evid.] 412(b)(1). Second, the evidence must[] ([A]) be necessary to rebut or explain scientific or medical evidence offered by the prosecutor, ([B]) concern past sexual behavior with the defendant and be offered by the defendant to prove consent, ([C]) relate to the victim's motive or bias, ([D]) be admissible under Texas Rule of Evidence 609, or ([E]) be constitutionally required to be admitted. [Tex. R. Evid.] 412(b)(2). Finally, the trial court must find that the evidence's probative value outweighs the danger of unfair prejudice. [Tex. R. Evid.] 412(b)(3).

*Lang v. State*, No. 02-22-00298-CR, 2024 WL 273591, at *6–7 (Tex. App.—Fort Worth Jan. 25, 2024, pet. ref'd) (mem. op., not designated for publication).

A party seeking to admit evidence as an exception under Rule 412(b) bears the burden to show that its probative value outweighs any unfair prejudice. *Robisheaux v. State*, 483 S.W.3d 205, 224 (Tex. App.—Austin 2016, pet. ref'd). The Rule 412(b)(3) balancing test differs from Rule 403's balancing test in two significant respects:

> First, the burden under Rule 412(b)(3) falls on the proponent of the evidence, the defendant, to show that the probative value of the evidence outweighs the unfair prejudice whereas under Rule 403 the opponent of the evidence bears the burden of showing that the danger of unfair prejudice substantially outweighs the probative value of the evidence. . . . Second, the general balancing test under Rule 403 weighs in favor of the admissibility of relevant evidence, while Rule 412(b)(3) weighs against the admissibility of evidence. The unfair prejudice language included in Rule 412 contemplates prejudice not only to the State but also to the victim who will potentially be stigmatized if the defendant is able to introduce evidence of sexual behavior.

*Zamora v. State*, No. 08-99-00284-CR, 2000 WL 1757960, at *9 (Tex. App.—El Paso Nov. 30, 2000, pet. ref'd) (not designated for publication) (citations omitted).

## C.     The Rule 412 Hearing

At the outset of the hearing, the State asked Alvarez's counsel which of the Rule 412 exceptions he was relying on for admission of the evidence of other sexual abuse. He responded, "We would be offering it under motive and bias[,] then the other admissible ways we can get into this alternative basis for child victim's knowledge of sexual matters[,] as well as evidence of alternate perpetrators' answer by false impression left with the jury." The trial court clarified that Alvarez was offering

16

the evidence under "[(]C[)] and [(]D[)]] or [(]E[)]],"[8] and Alvarez confirmed that those were the exceptions on which he was relying. Alvarez's counsel then proceeded to take the victim on voir dire to question her about two other males who had sexually abused her.

Alvarez's counsel asked the victim about Billy Gibbons, whom she said was her grandma's friend. The victim said that Gibbons had "sexually touched" her when she was eight years old.[9] She said that when she was on the balcony at her apartment and her grandma was in the shower, Gibbons had started touching her stomach on the first day she met him. Later, he took her in his pickup, pulled down her pants, and put his tongue on her vagina; he also made her put her hand on his penis and suck his penis. This went on for "a couple of weeks at max."

The victim also testified about sexual abuse by C.P. She said that she knew C.P. from school and that they had ridden the school bus together. The victim explained that C.P. had made her touch his penis while they were on the bus and that when they played hide and seek in the hallways at the apartment complex, he had made her suck his penis and had pulled her pants down and had rubbed his penis on

---

[8]It appears from the wording that the trial court may have been trying to correct the initial error in mentioning (D), which involves Rule 609 and deals with impeachment by evidence of a criminal conviction, because no evidence was put on suggesting that the victim had a criminal conviction. *See generally* Tex. R. Evid. 609. Thus, it would make more sense that Alvarez was attempting to use exceptions (C) and (E), but the record does not make this clear.

[9]As set forth below, counsel explained that the sexual abuse involving Gibbons occurred shortly after Alvarez, so the victim would have been around ten years old.

her vagina. The victim said that she had talked to the police, as well as a therapist, about these incidents.

During the State's questioning, the victim agreed that "those three people" (which included Alvarez) and the times that they had sexually abused her were very clearly differentiated in her mind. When the trial court asked for clarification on the timing of when the victim had been sexually abused by the three men, the State responded, "[C.P.] was first. He was a juvenile, and as she outcried [as] to hi[s actions], that is when . . . Alvarez began sexually abusing her, and it was within the time frame that . . . Alvarez was sexually abusing her that . . . Gibbons briefly sexually abused her as well." The State further noted that there was no implication of a false outcry by the victim because both Gibbons and C.P. had pleaded guilty to sexually abusing the victim. The State said that Mother knew about C.P.'s sexual abuse of the victim because the victim had outcried to Mother "pretty close in time to when it happened." Alvarez's counsel further explained to the trial court that Mother was dating Alvarez at the time of the victim's outcry regarding C.P.'s sexual abuse and that Mother had shared with Alvarez some of the details of C.P.'s sexual abuse of the victim.

The trial court then sought clarification:

So let me see if I understand this right, [defense counsel]. You want this jury to hear evidence that your client sexually assaulted this witness after he found out about [C.P.'s] sexually assaulting this witness, and you want this jury to hear that she was further sexually assaulted by Billy Gibbons? Is that what you're asking me to rule on?

18

Alvarez's counsel responded that he was offering it for the alternate basis for the victim's knowledge of sexual matters and evidence of an alternate perpetrator. The trial court stated, "[T]hey are going to get to ask this witness as to whether or not her mom told [Alvarez] whether she knew that your . . . client was told about this." Alvarez's counsel stated that he understood and that it was part of "the [d]efense strategy."

The trial court sustained the State's Rule 412 objection to the testimony of sexual abuse by other perpetrators:

> I fail[] to see any type of motive or bias that you can show from this witness['s] being sexually assaulted by two other people in addition to [Alvarez]. I don't understand what the . . . motive or bias would be. I mean, it . . . actually shows the opposite of that. . . . [I]t's not admissible under [Rules] 608 or 609. And I can't see how it's constitutionally required to be admitted. There's no medical evidence. There's no DNA. The previous sexual contact is not with your client.

Alvarez's counsel then requested permission to offer the victim's testimony as an offer of proof for all purposes, and the trial court stated, "So offered."

## D.    Failure to Carry Burden on Probative Value

In his brief, Alvarez sets forth the law on the Confrontation Clause; states that relevancy must first be shown before an alleged victim's sexual behavior may be admitted pursuant to Rule 412(b)(2)(E); provides a relevancy analysis; and then concludes that he was harmed when the trial court abused its discretion, "violating [R]ule 412 and the Confrontation Clause, by excluding evidence and

19

cross[-]examination that [the victim had] previously alleged sexual abuse by two other people in the same apartment complex around the same time." Even assuming that Alvarez showed that the acts perpetrated by C.P. and Gibbons so closely resembled those of the present case that they could explain the victim's knowledge about the sexual matters in question,[10] Alvarez fails to then provide any analysis for his Confrontation Clause ground, just as he failed to do so in the trial court.[11] *See generally* Tex. R. App. P. 38.1(i); *Mitchell v. State*, Nos. 09-19-00027-CR–09-19-00031-CR, 2020 WL 4006151, at *21 (Tex. App.—Beaumont July 15, 2020, pet. ref'd) (mem. op., not designated for publication) ("Making an objection or proffer under the Rules of Evidence does not preserve constitutional issues that are not raised."). Nor does he provide any argument or analysis for the Rule 412(b)(2) grounds—Rule 412(b)(2)(C) and (E)—that he relied on in the trial court. *See* Tex. R. App. P. 38.1(i); *Wolfe v. State*, 509 S.W.3d 325, 342–43 (Tex. Crim. App. 2017) (noting that we have no obligation to make an appellant's argument for him); *Lucio v. State*, 353 S.W.3d 873, 877–78 (Tex. Crim. App. 2011) (holding that appellant's point of error was inadequately briefed

---

[10]The State concedes the first prong of relevancy—that the prior acts clearly occurred because both C.P. and Gibbons pleaded guilty to the offenses.

[11]Although the trial court included the "constitutionally required to be admitted" exception found in Rule 412(b)(2)(E) when it summarized the grounds upon which Alvarez was relying, Alvarez never made reference to that ground or argued that his right to confront the witness would be violated if the evidence regarding C.P. and Gibbons were excluded.

because the brief contained a single-sentence assertion and was unaccompanied by any other argument or authorities)).[12]

But most glaringly, Alvarez failed to provide this court and the trial court with any argument on how the probative value of the evidence of the sexual offenses committed against the victim by C.P. and Gibbons outweighed the danger of unfair prejudice. *See* Tex. R. App. P. 38.1(i); Tex. R. Evid. 412(b)(3); *Hickman v. State*, No. 07-14-00193-CR, 2016 WL 736003, at *5 (Tex. App.—Amarillo Feb. 24, 2016, pet. ref'd) (mem. op., not designated for publication) (noting that appellant did not attempt to illustrate why the evidence was admissible because its probative value outweighed its prejudicial effect under either Rule 412 or Rule 403); *Zamora*, 2000 WL 1757960, at *9 ("Nowhere in his brief does Appellant allege or attempt to show that the probative value of the evidence outweighs any danger of unfair prejudice."). Because Alvarez failed to carry his burden under Rule 412(b)(3), we hold that the trial court did not abuse its discretion by excluding evidence of the sexual abuse committed against the victim by C.P. and Gibbons. *See Fuentes v. State*, No. 02-15-00356-CR, 2016 WL 6277369, at *6 (Tex. App.—Fort Worth Oct. 27, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding that trial court did not abuse its discretion by excluding specific, nonmaterial evidence of victim's past sexual behavior because appellant had failed "to carry his burden to prove (or even address)

---

[12]Moreover, it is difficult to see how evidence of these other sexual offenses would show the victim's motive or bias when the other perpetrators pleaded guilty to sexually abusing the victim.

that the probative value of the excluded evidence outweighed any unfair prejudice to [the victim] that would have been caused by its admission"); *Hickman*, 2016 WL 736003, at \*5 (same); *cf. Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000) (holding Confrontation Clause did not require admission of evidence of prior sexual-assault accusation because evidence had no probative value); *Faglie v. State*, No. 03-17-00281-CR, 2019 WL 847812, at \*4–5 (Tex. App.—Austin Feb. 22, 2019, pet. ref'd) (mem. op., not designated for publication) (reviewing challenges to exclusion of evidence under Rule 412 and Confrontation Clause and holding that trial court could have reasonably concluded that the minimal probative value of the sexting evidence, if any, did not outweigh the danger of unfair prejudice).

Accordingly, we overrule Alvarez's sole issue.

## IV. Conclusion

Having overruled Alvarez's sole issue, we affirm the trial court's judgments.

/s/ Dabney Bassel

Dabney Bassel
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 9, 2024